IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MONIQUE . SHIDER, | : <br> : <br> : Civil Action No. 08-8032 (PGS) <br> Plaintiff, : <br> : <br> v. : <br> : OPINION <br> COMMISSIONER OF SOCIAL SECURITY, : <br> : <br> Defendant. : <br> : |

SHERIDAN,  U.S.D.J.

    Plaintiff, Monique L. Shider ("Plaintiff" or "Ms. Shider"), seeks a review of the final decision of the Commissioner of Social Security Administration denying her claim for Supplemental Security Income Disability.  The Court has jurisdiction to review this matter under Section 405(g) of the Act and decides the matter without oral argument.

    Plaintiff seeks Supplemental Security Income beginning July 9, 2003 due to pain, anxiety and depression. The claim was denied initially on December 29, 2004 and upon reconsideration on February 18, 2005.  On May 26, 2006, ALJ Friedman heard the matter and denied Plaintiff's application thereafter. ( R.18-26).

    Here, the Plaintiff argues that the Administrative Law Judge ("ALJ") did not "include a reasoned explanation of administrative findings." (Plaintiff's Brief at p. 10).  That is, the ALJ failed to analyze the Plaintiff's Global Assessment of Functioning ("GAF") of 50 as assessed by Union

County Psychiatric Center during an assessment on August 16, 2004.[1] (R. 152-164). *See Cotter v. Harris*, 642 F. 2d 700 (3d Cir. 1981). The *Cotter* case requires the ALJ to discuss the supporting evidence but also requires that the ALJ "also give some indication of the evidence which was rejected." *Id.* at 705. Plaintiff espouses that discussion of both the supporting and rejecting evidence is necessary because "every vocational expert and most ALJs will testify/find that anyone with a GAF of 50 or less plainly cannot work on a sustained basis."[2]

I.

Plaintiff is a 30-year old woman who is a high school graduate as well as a graduate of cosmetology school. (R. 238). She has been receiving public assistance and Medicaid since 2003. On July 9, 2003, Plaintiff was shot near her mother's home. The 45 caliber bullet lodged in her liver and was not removed by surgeons. (R. 129-145). Since that time, Plaintiff has experienced pain in her right side when she lifts and bends, and she alleges anxiety and post-traumatic stress syndrome due to the trauma of the experience. In particular, she is always scared and panicked when visiting her mother because it is the neighborhood where she was shot. Despite these physical and mental injuries, there has been no significant treatment since then. According to Plaintiff, she takes care of her personal needs (e.g., drives a car, cooks and launders her clothes). (R. 108). Her other daily

---

[1] The Global Assessment of Functioning (GAF) is a numeric scale (0 through 100) used by mental health clinicians and physicians to subjectively rate the social, occupational and psychological functioning of adults, e.g., how well or adaptively one is meeting various problems-in-living. It is found in the Diagnostic and Statistical Manual of Mental Disorders ("DSM"), published by the American Psychiatric Association. A GAF of 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.

[2] Plaintiff's assertion of a GAF of 50 or less is unsupported by citation. *But see*, a GAF score of 50 "indicates [plaintiff] could perform some substantial gainful activity." *Hillman v. Barnhart*, 48 Fed. Appx. 26, 29 n 1 (3d Cir. 2002).

activities and social relationship functioning are significantly restricted by her combined ailments. (R. 122). She watches television and DVDs and visits the library, but walking, standing and climbing stairs are impaired (R. 100). More particularly, she walks slower and feels pain when climbing stairs, but has no problems paying attention, finishing tasks or following written instructions, and relating adequately with co-workers. (R. 110-112).

Before and after her injury, Plaintiff stocked shelves, sold merchandise and operated a cash register. Her most recent job was at a Home Depot in 2004 (after the shooting). Her job required that she stand for approximately four hours and walk about the same length of time, lifting a maximum of 10 pounds. (R. 95-96). Plaintiff testified that she quit that job because the work required excessive lifting and bending which caused her pain.

Thereafter, Plaintiff was seen at Union County Psychiatric Center for a Biopsychosocial Assessment on August 16, 2004. (R. 152-164). At the time of that assessment, Plaintiff was cooperative. Her attire was appropriate. Her gait and motor activity were normal, and stream of thought was normal. Her mood was anxious and upset (fearful and angry) due to being shot and her father's indifference to her. Most notably, her thought perceptions were normal, and her judgment was intact. She was diagnosed with post traumatic stress disorder and parent/child relationship problems. The assessment noted problems relating in a social environment due to the anxiety related to her gunshot wound. Occasional problems were noted as Plaintiff indicated that she could not work due to pain, as well as economic woes due to limited welfare payments. Her GAF was scored at 50.

On November 23, 2004, Plaintiff was examined by Jan S. Cavanaugh, Ph.D. of Industrial Medicine Associates for a consultative psychiatric examination. (R. 169-173). At the time of the evaluation, Plaintiff was expecting a child in April of 2005. She drove twenty miles to the

3

examination. She advised the doctor that she could not work due to pain in her right side resulting from the 2003 gunshot wound, and she had difficulty falling asleep due to pain. Moreover, her appetite decreased resulting in a 20-pound weight loss. On examination, Plaintiff was responsive to questioning and her social skills were adequate. (R. 171). She dressed appropriately and her grooming was good. Her gait, posture and motor behavior were normal and eye contact was appropriate. Her speech was intelligible and fluent, and her thought processes were coherent. Her mood was calm and she appeared relaxed and comfortable. Her attention and concentration were intact. She could count, add, and subtract, but she missed other simple calculations and could not multiply by three. Her memory was intact. Her intellectual functioning was estimated to be below average and she had limited general knowledge. (R. 171). Ms. Shider reiterated that on a daily basis she dresses, bathes and grooms herself and that she cooks, cleans, launders, shops and takes public transportation with some limitations due to pain. (R. 171). Ms. Shider spends her days doing chores, reading, watching television and listening to the radio. Dr. Cavanaugh found Plaintiff did not have psychiatric problems of such severity that would significantly interfere with her ability to function on a daily basis. (R. 172). Accordingly, he diagnosed an adjustment disorder and recommended that she continue with psychological and psychiatric treatment and undertake vocational training and job coaching. Her prognosis was fair. (R. 173).

On December 9, 2004, the Physical Residual Functional Capacity Assessment ("RFC") found Plaintiff had some limitations. That is, Ms. Shider could occasionally lift 50 pounds; frequently lift 25 pounds; stand and/or walk (with normal breaks for a total of about six hours in an eight-hour workday); sit (with normal breaks for a total of about six hours in an eight-hour workday); and she was found to be unlimited in her ability to push and/or pull (including operation of hand

and/or foot controls). There were no postural, manipulative, visual, communicative or environmental limitations noted. (R. 174-179). The RFC assessment further noted that Plaintiff was moderately limited in her ability to understand and remember detailed instructions. (R. 180-181). The psychiatric review technique similarly confirmed "Affective Disorder" (12.04). More specifically, the disorder caused mild limitations in her activities of daily living, including concentration, persistence and maintaining social functioning.

A March 16, 2005 psychiatric evaluation at Union County Psychiatric Center for a Biopsychosocial Assessment indicated that Plaintiff was alert and interactive, that her demeanor was tearful, and her mood was depressed and anxious. Her thought content at the time of the evaluation noted some homicidal ideation and that her judgment was impaired as evidenced by this aggressive ideation. (R. 201). On September 10, 2006, a psychiatric evaluation noted major depression and psychosis and that she had experienced auditory hallucinations and grandiose delusions. (R. 166). Plaintiff was prescribed Rispedal once a day and Lexapro (20 mg) for depression and post traumatic stress syndrome. (R. 167-168).[3]

Hearing Testimony

On May 26, 2006 at the hearing before ALJ Friedman, Ms. Shider testified that she is unable to work because of "severe pain" in her right side that radiates down into her leg from the bullet lodged in her liver (R. 225). When questioned how far she could walk, Plaintiff testified "about a mile or so," before she would have to slow down. (R. 242). She stated that she could stand for about 10 minutes at a time before pain would occur, and similarly stated that she could not perform

---

[3] Plaintiff missed an additional consultative examination in November 2006 due to incarceration. (R. 83). See Opinion at p. 8.

a "light" job where sitting down was required because of sharp pains from her waist down to her leg when sitting for long periods of time. (R. 266, 243).

As previously noted, Plaintiff confirmed she had not been treated by a doctor since 2004. According to Plaintiff, she was pregnant at the time of the shooting and she miscarried at the time (according to Judge Friedman, the pregnancy is not mentioned in the hospital report). Contrary to the above, Ms. Shider became pregnant and miscarried. After the shooting, Ms. Shider worked part-time at Home Depot doing displays and stocking merchandise. She quit because of the pain in her back and side when turning and bending. (R. 236). Her prescriptions at the time of the hearing were Lexapro and Klonopin at night for depression. At some point, Plaintiff smoked marijuana for her pain because "Aleve did not relieve the pain". (R. 235). At the time of the hearing, Ms. Shider lived in a rooming house and spent her days listening to music, straightening her room and sometimes writing poetry. She testified that she can sometimes lift a gallon of milk and about a 20-pound bag of potatoes.

At the hearing, Plaintiff testified that she receives counseling at Union County Psychiatric Center for psychiatric/substance abuse issues which started about a month earlier. (R. 241). She also testified that she is subject to criminal charges relating to conspiracy and bank fraud. (R. 242). Plaintiff acknowledged flashbacks and dreams of the shooting, crying spells during the day, aggression, suicidal ideation and adverse reactions to loud noises.

Vocational Expert Rocco Meolo testified at the hearing about Plaintiff's ability to perform light work such as simple, routine jobs involving low contact with the public. Ms. Shider could not perform her past relevant work because it involved working with and around the public. However, Mr. Meola found that there were other jobs available in the national economy that Ms. Shider could

6

perform. Additionally, Mr. Meola commented about jobs with sedentary exertional demands.  Mr. Meola found that there were approximately 1,200 such jobs in the region and in excess of 25,000 nationally.   These jobs involve occasional bending, stooping or kneeling, and  a person with a moderate limitation of  maintaining attention and concentration could perform such routine tasks.

From the factual findings, the ALJ made the following conclusions:

> After considering the evidence of the record, I find that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.
>
> I note that after the July, 2003 gunshot wound, the claimant went to work for Home Depot. Although she stated that she only worked there about a month, she made over $3,700, so it seems she worked longer than a month. The claimant has had essentially no treatment for pain or anything related to the gunshot wound since 2003. She has a history of cannabis use, but says this was for pain.
>
> She has been treated at UCPC Behavioral Healthcare; apparently she was in a day treatment program beginning a month prior to the hearing. She testified that the reason she was going for treatment was because she has "a lot of issues and stuff I was dealing with." The UCPC evaluation in March 2006 noted that she had panic attacks, anxiety attacks, was always worried and had issues with the courts (Exhibit 9F). One of the things noted in the UCPC records was that she was under stress due to pending criminal charges (the claimant testified that she is facing charges for conspiracy and bank fraud), and she also had lost twins due to a miscarriage. Earlier records discuss issues relating to the GSW (referring to gunshot wound) incident.
>
> The claimant testified that she lost her twins because she was pregnant when she was shot.  I note that the gunshot wound was in July, 2003. Dr. Cavanaugh noted in her November, 2004 report that the claimant was pregnant and expecting in April 2005 (Exhibit 4F). Curiously, the operative report of the gunshot wound makes no mention of her being pregnant and the claimant relates just one pregnancy.
>
> It is noteworthy that although she alleged disability since the July

>2003 gun shot wound, the claimant earned more money in 2004 than in any other previous year.
>
>Because the claimant had not had any recent assessment, we left the record open to get a new psychiatric consultative examination, with IQ testing. The claimant did not keep the appointment, apparently because she is incarcerated for an unknown period (exhibit 12B).
>
>The medical consultant at the state agency concluded that the claimant was able to perform "medium" work as defined in the Regulations. Based upon the record before me, and giving the claimant the benefit of the doubt concerning the sequelae of her gunshot wound, I conclude that the claimant would be slightly more limited with respect to her ability to lift and carry, and therefore that she can perform only light work as that term is defined in the regulations.
>
>As to mental impairment, the state agency opined that the claimant was only limited with respect to detailed instruction, dealing with the general public and responding to changes in a work setting. After reviewing the record in its entirety, I conclude that the DDS consultants' opinions in this regard are completely consistent with the medical evidence as a whole and therefore entitled to great weight.

Based on the above, the ALJ found Plaintiff could perform light work and not disabled.

II.

Review of the Commissioner's final decision is limited to determining whether the findings and decision are supported by substantial evidence in the record. *See Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); 42 U.S.C. §405(g). The Court is bound by the ALJ's findings of fact if they are supported by substantial evidence in the record. 42 U.S.C. §405(g)*; Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.*" Hartranft,* 181 F.3d at 360 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation omitted)); *see Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial

8

evidence is less than a preponderance of the evidence but more than a mere scintilla. *Id.*; *Morales*, 225 F.3d at 316; *Plummer*, 186 F.3d at 422. Likewise, the ALJ's decision is not supported by substantial evidence where there is "competent evidence" to support the alternative and the ALJ does not "explicitly explain all the evidence" or "adequately explain his reasons for rejecting or discrediting competent evidence." *Sykes v. Apfel*, 228 F.3d 259, 266 n.9.

The reviewing court must view the evidence in its totality. *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).

> A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence - - particularly certain types of evidence (e.g., that offered by treating physicians) - - or if it really constitutes not evidence but mere conclusion.

*Morales*, 225 F.3d at 316 (citing *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983)); *Benton v. Bowen*, 820 F.2d 85, 88 (3d Cir. 1987). Nevertheless, the district court's review is deferential to the ALJ's factual determinations. *Williams v. Sec'y of Health and Human Servs.*, 970 F.2d 1178, 1182 (3d Cir. 1992) (en banc) (stating that the district court is not "empowered to weigh the evidence or substitute its conclusions for those of the factfinder."). A reviewing court will not set a Commissioner's decision aside even if it "would have decided the factual inquiry differently." *Hartranft*, 181 F.3d at 360. But despite the deference due the Commissioner, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner's] decision is not supported by substantial evidence." *Morales*, 225 F.3d at 316 (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)).

III.

As noted previously, the Plaintiff argues that the ALJ did not "include a reasoned explanation of administrative findings." (Plaintiff's Brief at p. 10). That is, the ALJ failed to analyze the Plaintiff's GAF of 50 as assessed by the Union County Psychiatric Center during an assessment on August 16, 2004. Plaintiff also argues that there was insufficient discussion in the ALJ decision with regard to Plaintiff's GAF score of 50 and her ability to perform light work. This is untrue. The ALJ's analysis of the Plaintiff's GAF score was comprehensive.

The ALJ's decision discussed Plaintiff's GAF of 50 at length. He wrote:

> A Biopsychosocial Assessment showed that the claimant was cooperative, but anxious over a fear of being shot again. Motor activity was normal and productivity was spontaneous. She was reported to have a fearful mood with appropriate affect. Memory was normal and insight was good and judgment intact. She was diagnosed with post traumatic stress disorder and given a GAF of 50 (Exhibit 3F).

Moreover, the ALJ noted that "UCPC Behavioral Healthcare shows that the claimant had been diagnosed with major depression," and "claimant was anxious and tearful with pressured speech. "Although she was noted to have elevated motor behavior, thought processes were intact and insight was partially intact. She was given a GAF of 50." Considering the GAF of 50, the ALJ noted evidence from the medical consultants at the state agency ("DDS") that were contrary. DDS medical consultants found that Plaintiff could do medium work and that her only functional limitations mentally were with respect to detailed instructions, dealing with the general public and responding to changes in work setting.

Additionally, there is substantial evidence in the record to support the ALJ's conclusion. For example:

10

*\tOn August 16, 2004, Plaintiff's memory and insight were good and judgment intact, but she had post-traumatic stress disorder and a GAF of 50.

*\tOn March 16, 2006, Plaintiff had intact cognitive ability and elevated motor behavior, although her GAF remained at 50.

*\tThe State Medical consultant, knowing of the GAF of 50, found Plaintiff could do medium work.

*\tPlaintiff worked longer hours in 2004 after the shooting than in the year before the incident.

*\tThe Plaintiff had no ongoing or substantial medical treatment from the time of the incident.

*\tThe State agency consultant found Plaintiff "was only limited with respect to detailed instructions, dealing with the general public and responding to changes in work setting." The ALJ gave this opinion great weight.

A review of the ALJ's opinion and the record as a whole reveals that the ALJ carefully reviewed the matter considering both the GAF score plus the opinions of the experts.[4] The decision of the ALJ is affirmed, the case is dismissed.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

August 25, 2009

---

[4]\tThe ALJ also kept the record open to obtain another psychiatric examination, but Plaintiff failed to attend due to her incarceration. See Opinion at p. 8. Plaintiff does not appeal on this basis.